Bioi-iaedson, J.,
delivered the opinion of the court:
The cause of action set forth in the claimant’s petition is founded on two written contracts, made by Bobert B. Carter, November 18, 1812, with the Secretary of War, wherein he ageed to supply and issue all the rations, consisting of articles therein specified, which should be required of him, for the United States troops in Georgia and East Florida: by the first contract, from January 1,1813, to May 31, 1813, and by the second, from June 1,1813 to May 31,1814. Carterdied January 23, 1814, about four months before the time for completing the second contract on his part had expired, and before all the rations required for the troops had been delivered.
Immediately after the death of said Carter, one James Eoddy, *441 with tbe knowledge of the Secretary of War, whom he notified in writing, undertook to supply the remaining rations which should be called for on Carter’s contract, and did supply the same to the value of $61,145.50, which were accepted from him by the defendants.
A statement of the account of subsistencefurnished andof payments and charges against the same, on the two contracts, was madeupbythe accounting officers of the United States as follows:

*442 The credit of February 10,1814, allows for provisions issued down to January 20,1814, which was three days before Carter’s death. The credit of June 6,1821, allows for the provisions furnished by Roddy after the death of Carter, and $573.02 in addition, which no doubt accrued on account of rations delivered before Carter’s death, and not included in the previous items. The whole credit amounts to $158,198.91. Against this are charged six payments, amounting to $85,000, under dates previous to Carter’s death, the correctness of which the claimant does not controvert. There are also charged under dates subsequent to Carter’s death, February 2, $30,000, May 4, $20,000, and June 2,1814, $20,000; and on. the 6th of June, 1821, the balance, $3,198.91, was transferred to the credit of Robert C. Jennings, on an account which the defendants had against him, arising from his employment by the Government. The petitioner claims that those last three items were wrongly charged against Carter’s estate, of which he is administrator, and that he is entitled to recover for the amount of credits allowed in the account, less the payments charged befóte the death of his intestate.
No objection appears to have been taken to any item in 'this account by either of the original parties whom we have named during his life-time. After the death of Roddy his representatives applied to Congress for a settlement of this and other accounts in which he had been concerned. Subsequently those of Jennings made a similar application, and finally the then administrator of Carter’s estate, in 1835, petitioned for payment of a balance claimed on the contracts upon which this petition is founded. There were several reports upon these applications, but no payments were ever made or authorized. In 1857, on motion of Senator Hunter, the Senate referred to this court the memorial of the representatives of Robert B. Carter, with the accompanying papers. Thus the matter stood until February, 1866, when the present claimant was appointed administrator of the estate of said Carter, on the assumption that the previous administrator was dead, which, though not proved, the defendants do not controvert, and he thereupon filed his petition in this court only three or four days before the time when, by the Act March 3,1863, (12 Stat. L., p. 765, § 10,) he would have been barred of any right to bring an action on such a claim, which accrued six years before the passage of that act.
*443 The death of Carter, the contractor, and all the transactions under his contracts, except the statement of the account by the accounting officers, took place more than sixty years ago. Boddy and Jennings have long since died, and there is not a single living witness by whom to prove the delivery of the subsistence required by the contracts, the payments charged in the accounts, the business relations of the several parties concerned to each other, and the circumstances under which the accounting officers stated¡the account and entered the final settlement. All the proofs in the case are obtained from the account, documents, letters, and records produced from the Treasury and War Departments; and upon them the claimant is obliged to rely for proof that any rations or supplies were at any time delivered under the contracts. It is found that of the 8158,198.91 credited for rations issued, the amount of $01,145.50 was for those supplied by Boddy after the death of Carter; and it is presumed, and not controverted, that the balance, §97,053.41, was for subsistence furnished by Carter. The controversy which arises is wholly upon the correctness of the last four items of charges in the account as stated by the accounting officers, and those we will consider. The first of these was for a draft drawn by Bobert 0. Jennings on the Secretary of War, November 18, 1813, payable in sixty days after date, accepted by the War Department December 1, and negotiated and indorsed to a third party by said Jennings December 6, 1813. This was drawn in pursuance of instructions which Jennings had received from Carter through James Boddy. On the 5th of September, 1813, Carter wrote from Savannah, Ga., to the Secretary of War, saying that, from the movement of the troops on the Indian frontier, it became necessary for him to be near the scene of action, and frequently absent from that place for weeks, which rendered it difficult to draw funds as they were wanted, and that, therefore, he thought it best to have all his remittances made through the hands of his partner, James Boddy, at Charleston, as he could draw on him from time to time, as might be necessary, and that he had instructed said Boddy to attend to the negotiating for and receiving all moneys that might be going to him under his contract for that State. Carter, at the same time, sent a copy of this letter to Boddy, at Charleston. On the Sth of the same month Boddy wrote to Bobert C. Jennings, at Norfolk, Ya., inclosing the *444 copy of Carter’s letter to the Secretary of War, which he had received, and saying, “You will observe, from its contents, that he [Carter] calculates entirely on me for all his remittances, and intends drawing on me for what he may require. I shall not write to the Secretary on the subject, but leave the whole arrangement to you; and you are already informed as to the extent of his issues in Georgia, and you must take care that timely provision is made, in the cash way, for all the departments which may be required through you, and the amount deposited at my disposal in a way so as I can make use of it to meet his bills when they are presented, and make remittances to him when they are required.” These three persons were, at that time, understood at the War Department to be copartners, as is now proved to have been the fact. Without considering, at this point, what was the exact extent of that copartnership, we find that it discloses extensive confidential business relations among the parties, which, in connection with the somewhat indefinite, but very general, authority given by Carter to Eoddy, and by Eoddy to Jennings, in' their letters to which we have referred, we are compelled to hold that Jennings’ draft for $30,000 was rightly charged in the account, and was a valid payment by the defendants to Carter. The draft was accepted December 1, and was negotiated, and passed out of Jennings’ hands December 6,1813, which was nearly two months before the death of Carter. Whether or not the money obtained upon it went to Carter is not proved; but, from the tenor of the correspondence between the parties, we must presume that from the 5 th of September, 1813, to the date of his death — more than four months — Carter was drawing on Eoddy for money, from time to time, as he found it necessary, according to the intention expressed by him in his letter to the Secretary of War. The defendants are not responsible for the application of the money after they had paid it to Jennings through Carter’s own instructions.
It is no valid objection to this draft that it was drawn for an amount in excess of what was then due to Carter for supplies already delivered and credited. The tenth article of each contract admitted of advances being made, and provided that all such advances should be duly accounted for by way of set-ofi against the amount of supplies, and the surplus, if any, should be repaid to the United States immediately after the expiration *445 of the term of the contract, together with interest at the rate of 6 per centum per annum from the time of such expiration until the time the same should be actually repaid. And an examination of the account shows that each previous payment made to Carter himself was in advance of the credits then, allowed.
But even if the $30,000 paid on Jennings’ draft were not rightly charged in the account against Carter, the claimant cannot recover the same, for the reason that he has made no claim therefor in his petition. '
At the time of Carter’s death there had been paid to him $115,000, including the Jennings draft of $30,000, which should have been charged December 1,1813, when it was accepted, instead of February 2,1814, when it was paid. Up to the time of Carter’s death he had furnished rations on these contracts, as we have shown, to the extent only of $97,053.41, so that he was indebted to the defendants in the sum of $17,946.59 when he died. Nothing is therefore due tó Carter’s estate on account of supplies furnished under his contracts during his life-time. But the administrator seeks to recover for that estate full payment for all the subsistence furnished after Carter’s death by James Roddy without allowing to the latter anything whatever for the capital invested by him. We think that claim cannot be maintained either in law or justice. After Carter died, when no administrator appeared to fulfill his contracts, Roddy supplied all the remaining rations called for. The defendants accepted them from him, and he was entitled to payment for the same. While Roddy had no authority to involve Carter’s estate in debts or obligations if he made losses in fulfilling Carter’s agreements, he might have been liable to account for whatever profits he made by availing himself of Carter’s unfinished contracts. Even if the amount of any such profits could be recovered of the defendants in this action, none have been proved. But Roddy, by express direction, allowed the amount due to the defendants for advances made to Garter to be deducted from what was due to him, the said Roddy, for subsistence furnished after Carter’s death, and this gave to Carter’s estate the benefit of $17,946.59 of the amount which accrued by reason of the completion of the contract by Roddy. Thus Carter’s estate has lost nothing by Roddy’s transactions after Carter’s death, but on the contrary has gained thereby.
*446 After the death of Carter, said Jennings drew two other drafts of $20,000 each, which are charged in the account. This he did either because of the instructions which he had received from Eoddy while Carter lived, the necessity for thé continuance of which he knew still to exist, as Eoddy was engaged in Georgia in furnishing the rations which Carter had agreed to deliver there, or because he and Eoddy were general partners in business, as the findings set forth. In August, 1814, Eoddy wrote to the acting accountant of the War Department directing him to deduct from the amount due him the amount which Carter owed, and to remit the balance to him. This was only two months after the last draft of Jennings had been charged, and it does not appear that Eoddy knew how the account stood at that early day when he wrote that letter. He lived several years afterward, and there is no evidence that he ever objected to any items of the account or called for any further payments. ■ We think that these checks, drawn by Jennings on account of rations' furnished by Eoddy, under the circumstances of the partnership which existed between them, the instructions which Eoddy had given Jennings as to drawing-money on this contract, and their business relations to each other, were rightly charged in the account, and must stand as valid payments by the defendants.
Whether or not the balance of the account, $3,198.91, was rightly transferred by the accounting officers to the credit of Jennings alone, toward payment of an indebtedness in his name to the defendants, is wholly immaterial in this action, since, in our opinion, the present petitioner has no valid claim to it in either case. This balance accrued after the death of his intestate, on account of subsistence furnished by Eoddy, toward which neither the intestate’s legal representatives nor the property of his estate contributed anything whatever, nor did it arise from any profits shown to have been made by said Eoddy under the contracts of Carter. It was more than twenty years after the death of Carter, and more than thirteen years after the final settlement of the account by the accounting officers, before his legal representatives set up any claim to it, and in our opinion his administrator has not established his right to the same as against both Eoddy and the defendants. If the transfer was not legally made, it is for the representatives of Eoddy, and not those of Carter, to object to it.
*447 Tüe accoimting officers regarded Carter, Jennings, and.Roddy as general copartners in their several contracts with the Government and in their respective employments, and treated all their accounts as relating to one and the same interest, as is shown by the memorandum attached to the account as finally adjusted, and which is as follows:
“In the case of Robert B. Carter, late contractor, it is proper to state that he died before his contract expired, and that James Roddy, ,who was one of his sureties and concerned in the contract, undertook to complete the contract. Advances were accordingly made to him, and the abstracts of issues were all taken in his name, and the account in all respects except in name became his. The balance due Carter is in fact a balance due to Roddy, and he being a partner and concerned with R. C. Jennings, and having authorized any balance found due him, the said Roddy, to be entered to the credit of said Jennings in part of the large advances standing to his debit, growing out of his transactions as contractor and purchasing commissary, whose agent in the latter business was James Roddy, at Charleston, S. O., and so recognized by the Government, a transfer is accordingly made of the balance to the credit of the said R. C. Jennings, as was done in the settlement of James Roddy’s-accounts heretofore. In fact, all the parties named were but one concern, at the head of which was R. C. Jennings.”
After fifty-four years have elapsed since that account was made up, the exact information upon which the accounting officers were led to thus regard those persons is not preserved and proved. But we have in the case a copy of articles of copartnership entered into by and between Jennings, Roddy, and Carter, dated May 1, 1812, to extend for the term of five years from the 1st day of June then next following. The fifth article is broad enough to include the contracts upon which this action is founded, as well as Jennings’ public employment by the Government. It is as follows:
“ Art. 5. It is agreed and understood that all public as well as private contracts made, or employments held, from and after the commencement of this contract, (excepting that provided for in the third article already made,) by any one of the contracting parties, or the renewal of the above-mentioned contract which James Roddy has made, is to be for the general benefit of the copartnership, and the gain or profit oh .such em *448 ployments, contracts, or renewal of contracts shall be shared in and after the same manner pointed out for other business in the fourth article; that is, Eobert B. Carter is to share one-fourth of the profits, &c.”
Examining the fourth article, to which this expressly refers, and without which this fifth article, ending in “&c.,” is incomplete, we find that it provides that “ Eobert Baylor Carter shall share one-fourth of’ the net profits or gain made on all such business or trade, and the remainder of the net .profits shall be equally shared between Eobert C. Jennings and James Boddy; the expenses, charges, or loss on all such trade to be borne by each of the contracting parties in proportion as he would have shared in the profits according to this article.” In Carter’s letter of September 5, 1813, to the Secretary of War, he calls. James Boddy his partner, and authorizes him to attend to the negotiating for and receiving all moneys that might be coming to him under his contracts, which words imply greater authority than simply receiving the money when payable; and the letter of Boddy to Jennings, September 8,1813, turning over the whole business to the latter, indicates, in its whole tenor, that they all had a common interest in the business of this contract, and that their own accounts were intermingled. Befer-ring to one Dabney, in that letter,.Boddy says: “He stands charged on our books for $4,604.81, including $400 per Carter, in addition to which he had an order for the cargo of flour, &c., left at Wilmington by Kerr. I have not written him an answer to his letter, neither do I intend to do it at present, until such time as I am well satisfied he .has laid out all the funds which you have furnished him with; and an understanding ought to take place before he gets any more.” It seems to have been the common course of their business for Jennings to furnish the-money used, and this may have been because he was residing at Norfolk, Ya., and could reach Washington more easily than his partners could from South Carolina and Georgia, or because,, being employed by the Government to raise funds, he was in constant communication with the Departments.
These facts, which have been proved after the lapse of from fifty-three to sixty years and more since the transactions occurred, tend strongly to’ show that the accounting officers, acting in their official capacity near the times when the events took place, were correct in regarding Jennings, Carter, and *449 Itoddy general copartners, as among themselves, as to all their contracts and public employments, and in stating and settling the accounts accordingly. Bat whether or not they are sufficient to warrant the conclusion arrived at by those officers we give no opinion, since we hold, on other grounds which have been stated, that the claimant is not entitled to recover.
The claimant's petition is dismissed.
The Chief-Justice was not present when this case was argued, and took no part in the decision.